Kent W. Spence (WSB # 5-2399)
Noah W. Drew (WSB # 7-4888)
THE SPENCE LAW FIRM, LLC
15 South Jackson Street
P.O. Box 548
Jackson, Wyoming 83001
(307) 733-7290 telephone
(307) 733-5248 facsimile
kspence@spencelawyers.com
drew@spencelawyers.com

U.S. DISTRICT COURT
WESTERN DISTRICT ARKANSAS
FILED
DEC 2 6 2012
CHRIS R. JOHNSON, CLERK
BY
DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

| | |
|---|---|
| ANTHONY LYNN SHUMAKE, as Administrator of the Estates of ROBERT SHUMAKE, deceased, WILENE SHUMAKE, deceased, and NICHOLAS SHUMAKE, deceased, and on Behalf of the Wrongful Death Beneficiaries of ROBERT SHUMAKE, deceased, WILENE SHUMAKE, deceased, and NICHOLAS SHUMAKE, deceased,<br><br>Plaintiff,<br><br>vs.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | CIVIL ACTION NO. 12-4157 |

## COMPLAINT FOR DAMAGES

### I. PARTIES

1.  Plaintiff, Anthony "Tony" Shumake is the son of Robert and Wilene Shumake, deceased, and the father of Nicholas Shumake, deceased.

2.  Tony Shumake brings this lawsuit as the duly appointed and serving Administrator of the Estates of Robert Shumake, deceased, Wilene Shumake, deceased, and Nicholas Shumake, deceased, having been appointed by the County Court of Bowie County, Texas, on April 2, 2012. He brings this action on behalf of all participating

Shumake, deceased, pursuant to the Arkansas Survival Statute, Ark. Code Ann. § 16-62-101, and the Arkansas Wrongful Death Act, Ark. Code Ann. § 16-62-102, for personal injury, wrongful death and survival damages caused by the negligent and malicious conduct of the defendant.

3. Defendant, United States of America, is a sovereign government consenting to be sued for civil liability in accordance with the Federal Tort Claims Act, 28 U.S.C.A. § 2671 et seq. ("FTCA").

4. The Albert Pike Recreation Area ("Albert Pike") was and is administered and controlled by the United States Forest Service ("USFS"). The USFS is an agency of Defendant, USA, under the direct jurisdiction of the United States Department of Agriculture ("USDA").

5. A team of rangers and interdisciplinary personnel were responsible for the long term planning and implementation of policy and safety at Albert Pike.

6. District Ranger James Watson ("Watson") was an employee of the USFS pursuant to 28 U.S.C.A § 2671 and directed the renovation of Albert Pike in 2000 and in particular the construction of the campsites at Loop D (as more fully alleged below, Loop D is where the Shumake's perished on June 11, 2010). At all relevant times, Watson was acting within the scope of his employment with the United States of America Government.

7. Hydrologist James Clinganpeel ("Clinganpeel"), was an employee of the USFS pursuant to 28 U.S.C.A § 2671 and was charged with determining the flood plain within Loop D. At all relevant times, Clinganpeel was acting within the scope of his employment with the United States of America Government.

8. Upon information and belief, other employees/agents of the United States USFS and/or USDA were involved with the planning, construction and administration of Albert Pike Loop D. It is further believed that these employees' or agents' actions and/or inactions contributed to the deaths of Robert, Wilene and Nicholas Shumake. It is also believed that these employees/agents were working for the USFS and/or the USDA as contemplated by 28 U.S.C.A § 2671, and that at all relevant times they were acting within the scope of their employment with the United States of America Government.

9. Defendant, United States of America, was and is responsible for the actions, inactions, decisions, omissions, operations, fault, neglect and malicious conduct of the officers, agents and employees of the USFS and USDA.

10. Pursuant to 28 U.S.C. § 2680(a), this claim is not based upon the exercise or performance, or the failure to exercise or perform a discretionary function or duty on the part of defendant or its employees/agents.

## II. JURISDICTION AND VENUE

11. Plaintiff filed a Notice of Claim in proper form based upon the following facts within the applicable limitations period as required by 28 U.S.C.A. § 2675(a) and 28 C.F.R.A. § 14.2.

12. The Notice of Claim was filed on October 3, 2011, with the appropriate federal agency – the USDA/USFS.

13. On April 5, 2012, the Notice of Claim was amended pursuant to 28 C.F.R.A. § 14.2(c). The Notice of Claim was again filed with the USDA/USFS.

14. As of the filing date of this complaint, more than six months have passed without final disposition of Plaintiff's above-referenced administrative claims. All

procedural prerequisites to filing this action have been satisfied, met, or otherwise waived, including the exhaustion of all administrative remedies under the FTCA.

15. Pursuant to 28 U.S.C.A. 2675(a), Plaintiff invokes his option to deem the claims finally denied. As such, the Court's jurisdiction over this matter is now appropriate.

16. The United States District Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1346(b) because plaintiff is bringing a claim against the United States for money damages for wrongful death caused by the negligent, malicious or wrongful acts and omissions of employees or agents of the government while acting within the scope of employment under circumstances where the United States, if a private person, would be liable in accordance with law.

17. Jurisdiction in this Court is also proper pursuant to 28 U.S.C. § 1331.

18. Venue is proper in the Western District of Arkansas pursuant to 28 U.S.C. § 1402(b) because the acts and/or omissions complained of occurred within this District.

### III. FACTUAL BASIS FOR CLAIM

19. Plaintiff hereby incorporates by reference all statements and allegations contained in all paragraphs above as if fully set forth herein.

#### *Introduction*

20. The USFS first developed Albert Pike in 1934 as part of the Ouachita National Forest. At all relevant times, Albert Pike was a developed campground within the Ouachita National Forest. It is located approximately six miles north of Langley, Arkansas, in Montgomery County. Albert Pike is administered by the USFS, Ouachita National Forest, Hot Springs, Arkansas.

21. USFS personnel stationed at the Caddo-Womble Ranger District Office in Glenwood, Arkansas also administer and oversee Albert Pike.

22. According to the USFS website, Albert Pike has been favored by generations of families who returned to the area year after year to recreate.

23. There are 54 campsites within Albert Pike dispersed among four areas, or loops, and are surrounded by steep, rugged terrain.

24. The campground in question, Loop D, is located in the floodplain of the Little Missouri River, a designated Wild and Scenic River, which runs through the campground.

25. Rain that falls in the watershed of the Little Missouri River runs down the mountainsides and accumulates quickly swelling creeks and streams that feed the Little Missouri, causing the river to rise very rapidly and flood areas in and around Albert Pike.

### *History of Flooding and Construction of Loop D*

26. In 2000, the USFS received $600,000 to renovate Albert Pike. Now-retired District Ranger Watson directed the renovation of Albert Pike and in particular the construction of Loop D.

27. Albert Pike has a long history of documented flooding events dating back to at least 1940. Between 1940 and 2010 the government documented flood events in the years 1940, 1961, 1975, 1982, 1987, 1990, 2001, 2006, 2008, and 2010.

28. Watson, a government employee, had personal knowledge of the history of flooding with Albert Pike and in particular Loop D. In 2000 or 2001 – shortly before construction of Loop D began – a camper's vehicle and possessions were washed downstream near the eventual location of the campsite. The government, through

Watson, was aware there were on average two flooding incidents per year at the campsite.

29. According to USFS Law Enforcement, there were at least nine (9) flooding events between 2000 and 2008.

30. On July 3, 2004, Loop D flooded only three (3) days after construction and renovations were completed at Albert Pike. USFS employees were called out to assist campers due to flooding in Albert Pike. Incident reports show that the USFS proactively notified campers of flood dangers based on weather and flood forecasts at that time.

31. Under the National Environmental Policy Act, 42 U.S.C. 4321 et seq. (NEPA), and its implementing regulations contained in 40 C.F.R. 1500 - 1508, the USFS was required to prepare an Environmental Assessment of environmental impacts of any proposal to expand the facilities at Albert Pike.

32. An Environmental Assessment is a form of documentation used by the USFS to comply with NEPA. According to FSH 1909.15, the Environmental Assessment serves, in relevant part, to: (a)(1) Briefly provide sufficient evidence and analysis for determine whether to prepare an environmental impact statement or a finding of not significant impact; and (b) Shall include brief discussion of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted (40 C.F.R. 1508.9).

33. In order to complete the Environmental Assessment, input was collected from various interdisciplinary United States Government team members including Clinganpeel and Soil Scientist Ken Luckow ("Luckow").

34. One method used by the USFS to determine the location of flood plains is to consult soil maps. Soil maps are prepared using soil data from field studies. This soil data is used to prepare soil maps that represent certain soil types in specific locations. Soil scientists use soil types to define certain areas that are prone to flooding. Luckow used this process along with field analysis to make his determination that the proposed construction site of Loop D was within the 100-year flood plain.

35. On or about November 28, 2001, Luckow sent a letter to Watson informing him that the area in and around Loop D was "subject to frequent flooding" and that "*Evidence of a recent major flood event was observed along the river corridor.*"

36. Based on these findings, Luckow informed Watson that (1) the proposed construction was within a 100-year floodplain; (2) that, if constructed, the campsite must be "primitive" – without improvements such as roads, buildings, and electricity; and (3) flood warning signs needed to be posted.

37. Luckow's recommendations concerning the location and construction of Loop D were premised on the directives set out by EO-11988 and Ouachita National Forest Amended Land and Resource Management Plan, along with FSM 2527.3; FSM 2527.31; FSM 2527.5; FSM Region 8 Supplement dated 6/7/1992 – FSM 2527.02; FSM Region 8 Supplement dated 6/7/1992 – FSM 2527.5; and USFS EM 7100-15.

38. The Ouachita National Forest Amended Land and Resource Management Plan includes, in relevant part, the following directives:

   a. Inspect recreation facilities annually to comply with health and safety requirements (0.13);

   b. Protect the health and safety of Forest visitors; Perform annual Safety inspection at all developed sites (3.13); and

   c. Locate proposed critical facilities (system roads, recreation facilities, and buildings) outside 100 year flood plain (Executive Order 11988) and wetlands (Executive Order 11990) unless no practicable alternative location exists.

39. In December of 2001, Clinganpeel, traveled to Loop D to survey and evaluate the exact location of the 100-year floodplain. Watson showed Clinganpeel the proposed construction site.

40. Contrary to accepted custom when determining whether planned construction will be within a flood zone, there were no building markers, strings, or flags to indicate the location of buildings or their proposed elevations. As a result, Clinganpeel based his survey in relation to the proposed construction on Watson's representations.

41. Clinganpeel used what is considered the Bankfull Evaluation Method to survey/evaluation the flood plain within Loop D.

42. Clinganpeel failed to complete his evaluation of the flood plain as Watson interrupted his work and informed him that he had determined the flood plain on his own and that the proposed construction was outside of the flood plain. Watson later admitted in the USDA Post Incident Investigation that he, in effect, "eyeballed" the boundaries of the flood plain and never took any measurements.

43. Clinganpeel knew that Watson's evaluation of the flood plain was inaccurate and fraught with danger, yet did nothing to correct it.

44. Clinganpeel later admitted in the USDA Post Incident Investigation that the Bankfull Evaluation Method was not an approved method to evaluate flood plains by the USFS as it was inaccurate.

45.     In addition to ignoring Luckow's determination that the campsite was within the 100-year floodplain, neither Watson nor any other USFS employee or agent posted warning signs alerting campers to the risk of flooding.

46.     Pursuant to FSM 2527.3; FSM 2527.31; FSM 2527.5; FSM Region 8 Supplement dated 6/7/1992 – FSM 2527.02; FSM Region 8 Supplement dated 6/7/1992 – FSM 2527.5; and USFS EM 7100-15, signage within Loop D should have included, at a minimum, postings that the area was within a 100 year flood plain, the highest recorded flood level and postings showing the probable 100-year flood height.

47.     Failure to post and display warning or notice signs was contrary to USFS policy, procedure and applicable regulations in place from the time of construction through the flood of June 11, 2010.

48.     Watson negligently and/or maliciously disregarded Luckow's findings that the campsite should remain unimproved to avoid the known danger; instead, he ordered the building of roads accessing the flood plain (Loop D), the construction of campgrounds for tents and R.V.s, the installation electric and water hookups, sewage disposal facilities, and other amenities.

49.     Watson's malicious motivation to construct the Loop D campsite despite the known dangers was so strong that he not only tried to omit Luckow's findings from the Environmental Assessment, but he intentionally and maliciously misrepresented the location of the 100-year flood zone in relation to Loop D as well. Based upon these intentional misrepresentations, Watson issued a Decision Notice to implement the proposed construction at Albert Pike and Loop D contained therein.

50. Even if Watson and the USFS erroneously thought that Loop D was above the 100-year flood plain, Loop D was actually still within a flood plain. Therefore, USFS directives on building in a flood plain and mandatory signage would still apply.

*Employee/Agent Training, Communication and Warning Systems at Albert Pike*

51. The USFS utilized a volunteer host program to manage Loop D after construction was completed in 2004. Reuben and Cathy Cleveland were selected to perform Campground Host duties at Loop D from May 24, 2010 through July 4, 2010.

52. On May 24, 2010, a recreation technician for the Ouachita National Forest, Thomas Ledbetter ("Ledbetter"), met with the Clevelands to discuss their duties and responsibilities, and to issue equipment and supplies. During this orientation, Ledbetter failed apprise the Clevelands of the fact that Loop D was in a flood plain and subject to flash floods, or provide guidance on emergency procedures as required by FSM 1834.2 and Section 21.04 of the FSM 6709.11.

53. However, Ledbetter did not supply the Clevelands with a two-way USFS radio because the two-way repeaters in Albert Pike had been malfunctioning for approximately six months. USFS personnel are dependent on the established radio network because cellular phone reception is nonexistent within Albert Pike. The USFS was aware of the malfunction, and due to either negligence or a conscious disregard of a known risk in the face of probable harm did nothing to fix it.

54. As it pertains to Albert Pike, the USFS does not have an actual "Early Warning System," as is contemplated in the use of a water level gauge with an alarm to warn of rising waters or an "Emergency Warning Plan" as it pertains to severe weather. Nor does the USFS have a weather policy or severe weather warning procedure or requirements in place for notifying visitors of severe weather conditions at Albert Pike,

with the exception of fire danger during the dry season. There is no established or conceivable social, economic or political policy justifying the failure to warn Plaintiff's family.

### *The Week of June 10, 2010*

55. On Monday, June 7, 2010, Robert and Wilene left their home in DeKalb, Texas, with their grandson Nicholas for Albert Pike in their fifth wheel camper. Robert and Wilene's plan was to stay at Albert Pike through Thursday, June 10, 2010. Loop D was chosen so they could sit in the shade relaxing and reading while also watching Nicholas as he swam and played in the Little Missouri River.

56. Robert, Wilene and Nicholas paid $16 to camp at Loop D for the evening of June 10, 2010.

57. The USDA and the USFS charged Robert, Wilene and Nicholas to enter and go on to Loop D for a recreational purpose as defined by Ark. Code Ann. §§ 18-11-302.

58. Pursuant to Ark. Code § 18-11-302(5), camping is a recreational purpose.

59. Robert and Wilene drove with Nicholas daily toward Langley, Arkansas, to get cell phone reception so Nicholas could call his parents. Nicholas would update his mom and dad on the adventures of the day, what rocks he had found and how much fun he had swimming in the river. The morning of Thursday, June 10, 2010, Robert and Wilene called Nicholas' parents to let them know they were going to stay one extra day.

60. On June 10, 2010, high pressure began building over the Southeast United States and a storm system moved slowly from northeast Texas into southwest Arkansas. According to the National Weather Service, a "flash flood watch" was issued

at 11:58 a.m., Thursday, June 10, 2010.  This watch was to remain in effect until 7:00 p.m., Friday, June 11, 2010.  A watch means a flash flood is possible in the area.  The storm system brought heavy rain to the area.

61.    The National Weather Service issued a "flash flood warning" at 1:57 a.m., Friday, June 11, 2010.  A warning is issued when a flash flood is imminent or occurring in the area.  Rainfall totals through 7:00 a.m. on June 11th 2010, in areas immediately adjacent to Albert Pike reached 6.83 inches at Mount Ida (Montgomery County), Arkansas, 6.78 inches at Hopper (Montgomery County), Arkansas; and, 6.55 inches at Glenwood (Pike County), Arkansas. The National Weather Service ("NWS") estimated 6-8 inches of rain fell on the Albert Pike in the 24-hour period ending at 7:00 a.m. on June 11, 2010.

62.    United States Geological Survey ("USGS") data shows that between 11:30 p.m. on June 10, 2010, and 3:10 a.m. on June 11, 2010, the Little Missouri River rose 20 feet, cresting at more than twenty-three feet at the Langley water gauge 8.9 miles downstream from Albert Pike.  The discharge rate at that time went from 78 cubic feet per second "cfs" to an undetermined value exceeding 20,000 cfs.  USGS employees estimated preliminary measurements for the discharge rate at Loops C and D of Albert Pike to be approximately 60,000 cfs.

63.    First reports of the disaster at Albert Pike occurred on the morning of Friday June 11th 2010. Nicholas's parents, Tony and Barbara, were on their way to Oklahoma to deliver cattle when they heard news of the flood.  Robert and Wilene's other son, Wade, drove up to Albert Pike to help his parents.

64.    When Wade arrived at Albert Pike, the massive amount of devastation was readily apparent.  The Little Missouri was swollen with trees, brush, vehicles and

campers floating downstream, and emergency rescue inundated the roads around Albert Pike. Wade was not allowed into Loop D to find his parents; rather he was asked to wait with other families at a nearby church while rescuers brought out survivors.

65. After several hours of waiting, a family friend and rescue personnel approached Wade to identify two bodies, Robert and Nicholas Shumake. Robert and Nicholas were found only several feet apart from one another outside of their camper. The Shumake's camper had been carried about 100 yards from where it was initially located. The camper's side was ripped open, leaving it almost unrecognizable.

66. The flood carried Wilene Shumake further downstream. Her body was finally found on Sunday, June 13, 2010, downstream from Loop D and next to a debris pile.

### IV. WRONGFUL DEATH CAUSE OF ACTION AGAINST THE UNITED STATES OF AMERICA

67. Plaintiff hereby incorporates by reference all statements and allegations contained in all paragraphs above as if fully set forth herein.

68. At all relevant times, Defendant and its employees and agents owed a duty to Robert, Wilene and Nicholas Shumake, in light of all relevant circumstances, to exercise reasonable and due care.

69. Defendant and its employees and/or agents breached their duty to Robert and Wilene Shumake and Nicholas Shumake as a result of their negligent and/or malicious acts and omissions including, but not limited to, the failure to guard or warn against an ultra-hazardous condition, use or activity Defendant knew to be dangerous.

70. Defendant's employees and/or agents, particularly Watson, Clinganpeel and others had actual knowledge of the extreme danger and ultra-hazardous condition

created by heavy rainfall and subsequent flooding of camping at the precise location of Loop D of Albert Pike where Defendant invited, and knew members of the public were camping and/or recreating.

71.     Defendant and its employees and/or agents breached their duty to Robert and Wilene Shumake and Nicholas Shumake as a result of their negligent and/or malicious acts, failures, and omissions in the following manner:

i.   Negligently and/or maliciously disregarding applicable, specific and mandatory policies, procedures, regulations, protocols and orders;

ii.  Negligently and/or maliciously conducting an adequate and proper environmental assessment or environmental impact statement to determine the impact of renovating Albert Pike, and in particular, the potential and obvious threat from flooding to the safety of campers using Loop D, at the time of the expansion and renovation of Albert Pike in 2000 and 2001 and thereafter;

iii. Negligently and/or maliciously disregarding information and instructions that Loop D was located within the 100 floodplain of the Little Missouri River;

iv.  Negligently and/or maliciously using improper methods to determine the 100-year floodplain elevation and further using those improper methods as a basis to validate the construction of Loop D in Albert Pike;

v.   Negligently and/or maliciously disregarding the known risk of catastrophic flooding when Loop D was constructed in a 100 year floodplain, particularly in view of the surrounding topography of the area and documented history of flooding events;

vi. Negligently and/or maliciously planning, locating, constructing, approving and allowing modernized campsites and modernized overnight camping facilities within a 100 year floodplain;

vii. Negligently and/or maliciously failing to post warning or notifications signs prominently at the entrance to and throughout Albert Pike, and in particular Loop D of the potential of flash flooding in the area;

viii. Negligently and/or maliciously failing to post signs prominently throughout Loop D notifying campers that the campsite was in a 100 year flood plain, that Loop D is subject to regular flooding and of the highest recorded flood level in that particular area;

ix. Negligently and/or maliciously failing to plan, develop and maintain equipment in Albert Pike, and particularly within Loop D, that would provide warnings to campers of imminent flash floods or flash flood warnings;

x. Negligently and/or maliciously failing to develop, implement, maintain and repair communications capability between Albert Pike, Loop D and other offices within Ouachita National Forest and other agencies of the federal, state and local governments regarding warnings of heavy rain, potential flooding and/or flash flooding and other severe weather occurrences;

xi. Negligently and/or maliciously failing to train and/or failing to implement a policy and procedure to warn campers within Albert Pike, and in particular Loop D, of the potential for flash flooding in the event of heavy rains;

xii. Negligently and/or maliciously failing to implement 24-hour dispatch services for emergency situations at Albert Pike to ensure the safety of USFS employees and campers.

xiii. Negligently and/or maliciously failing to train and/or failing to implement a policy and procedure to monitor weather forecasts, watches and warnings in the Ouachita National Forest, and in particular Albert Pike, and to provide that information to persons entering or camping within Albert Pike areas subject to flooding and flash floods;

xiv. Negligently and/or maliciously failing to train and/or failing to implement a policy and procedure regarding the development, maintenance and implementation of contingency plans for emergency services, evacuation or search and rescue services for campers in the event of a flash flood or other severe weather within Albert Pike, and in particular Loop D;

xv. Negligently and/or maliciously failing to take all reasonable, necessary and appropriate precautions and measures to protect the lives, safety and property of persons who utilized Albert Pike, and in particular Loop D, and to otherwise maintain the campground and surrounding floodplain in a safe manner.

72. As invitees, the USFS and the USDA owed a duty to Robert, Wilene and Nicholas Shumake to use ordinary care to maintain the premises in a reasonably safe condition to prevent injury to her life, safety and property.

73. Despite actual knowledge of deadly conditions, the USFS and the USDA negligently and/or maliciously violated their obligations to exercise due care for the

lives, safety and property of Robert, Wilene and Nicholas Shumake in failing to take the precautions and in the negligent and malicious acts and omissions set forth above.

74. As a direct and proximate result of the negligent and/or malicious acts and omissions described herein, Robert Shumake, Wilene Shumake and Nicholas Shumake were fatally injured and Plaintiff and all beneficiaries suffered harm as more particularly set forth below in the section of this complaint entitled "Damages."

## V. DAMAGES

75. Tony Shumake, as Administrator of the Estates of Robert Shumake, deceased, Wilene Shumake, deceased, and Nicholas Shumake, deceased, and on behalf of the Wrongful Death Beneficiaries of Robert Shumake, deceased, Wilene Shumake, deceased, and Nicholas Shumake, deceased, for their claim for personal injury, wrongful death and survival damages on behalf of said Estates and Wrongful Death Beneficiaries asserts claims for the following:

   a. Compensatory damages, both past and future, including, but not limited to the physical injuries and death described herein;
   b. All pecuniary injuries, including economic loss, loss of wages, benefits and economic opportunity;
   c. Pain and suffering;
   d. Mental anguish;
   e. Conscious pain and suffering before death;
   f. Loss of life, loss of enjoyment of life, loss of consortium, loss of services and contributions, loss of parental guidance,
   g. Medical expenses, and funeral and burial expenses;
   h. Property damage;

      i. Costs of litigation and any and all further relief to which Plaintiff is entitled to by law.

76. Plaintiff seeks any and all attorney's fees, costs and expenses to which he may be entitled under applicable law.

77. Plaintiff seeks any post-judgment interest to which he may be entitled under applicable law.

WHEREFORE, Plaintiff, ANTHONY LYNN SHUMAKE, in his representative capacity, requests this Honorable Court to grant judgment against Defendant, United States of America as follows:

(a) For all general and special damages as alleged herein and within the jurisdiction of the Court, in an amount to be proven and apportioned at trial;

(b) For any and all damages suffered by the Estates of Robert Shumake, Wilene Shumake and Nicholas Shumake allowed under the Arkansas Survival Statute, Ark. Code Ann. § 16-62-101;

(c) For any and all damages for the wrongful death of Robert Shumake, Wilene Shumake and Nicholas Shumake allowed under the Arkansas Wrongful Death Statute, Ark. Code Ann. § 16-62-102;

(d) For any and all other compensatory damages allowed under applicable law;

(e) For any and all attorney's fees and expenses allowed under applicable law;

(f) For all costs, including but not limited to expert witness fees and expenses herein and all interest allowed under applicable law; and

(g) For all other relief, both special and general, to which Plaintiff may be justly entitled, as this Honorable Court deems proper.

Dated December 24, 2012.

Respectfully submitted,

THE SPENCE LAW FIRM, LLC

Kent W. Spence (WSB # 5-2399)
THE SPENCE LAW FIRM, LLC
15 South Jackson Street
P.O. Box 548
Jackson, Wyoming 83001
(307) 733-7290 telephone
(307) 733-5248 facsimile
kspence@spencelawyers.com

and

THE SPENCE LAW FIRM, LLC

Noah W. Drew (WSB # 7-4888)
THE SPENCE LAW FIRM, LLC
15 South Jackson Street
P.O. Box 548
Jackson, Wyoming 83001
(307) 733-7290 telephone
(307) 733-5248 facsimile
drew@spencelawyers.com